UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DAVID J. ROBINSON,            )
                              )
    Plaintiff                 )
                              )
v.                            )        No. 2:11-cv-56-JHR
                              )
JO MILLER, f/k/a Jo Pollock, and )
HERBERT A. MILLER,            )
                              )
    Defendants                )

## MEMORANDUM DECISION ON DEFENDANTS' MOTION TO DISMISS

The defendants move to dismiss Counts V and VI of the plaintiff's amended complaint.[1] I grant the motion.

### I. Applicable Legal Standard

The motion invokes Fed. R. Civ. P. 12(b)(6). Defendants' Motion to Dismiss Count V and VI of Plaintiff's Complaint ("Motion") (Docket No. 7) at 1.[2] With respect to Rule 12(b)(6), as the Supreme Court has clarified:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

---

[1] The motion was filed before the plaintiff filed an amended complaint. *Compare* Docket Nos. 7 & 10. Counts V and VI of the original and the first amended complaint appear to be substantially the same. Complaint (Docket No. 1-2 ¶¶ 81-95; First Amended Complaint ("Amended Complaint") (Docket No. 10) ¶¶ 81-95. No party has suggested that the motion should not apply to the Amended Complaint.

[2] Actually, the motion, which apparently was filed in the Maine Superior Court before the defendants removed the action to this court, invokes M. R. Civ. P. 12(b)(6), but for purposes of the motion, the federal and state rules are essentially identical.

1

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted).[3]

"In ruling on a motion to dismiss [under Rule 12(b)(6)], a court must accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiffs." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001). Ordinarily, in weighing a Rule 12(b)(6) motion, "a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Id*. "There is, however, a narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.* (citation and internal quotation marks omitted).

## II. Factual Background

The First Amended Complaint includes the following relevant allegations.

The plaintiff, a resident of Falmouth, Maine, was employed as vice-president for finance of Miller Industries, a Maine corporation with a principal place of business in Lisbon Falls, Maine, and wholly owned by defendant Herbert A. Miller, from August 1982 through July 2010. Amended Complaint ¶¶ 1, 4, 6. Defendants Jo Miller and Herbert A. Miller, a married couple, reside in San Francisco, California, and formerly resided in Maine, where they continue to own and manage properties and business interests. *Id*. ¶ 2.

The Miller Hydro Group is a Maine corporation with a principal place of business in Lisbon Falls, Maine. *Id*. ¶ 5. Herbert A. Miller owns 75% of the stock of the Miller Hydro

---

[3] In so explaining, the Court explicitly backed away from the Rule 12(b)(6) standard articulated in *Conley v. Gibson*, 355 U.S. 41 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968 (quoting *Conley*, 355 U.S. at 45-46). The Court observed: "[A]fter puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 1969.

Group. *Id*. The plaintiff also served as the controller of the Miller Hydro Group between 1982 and 2010. *Id*. ¶ 7. Over the more than 28 years that he was employed by Miller Industries, the plaintiff was Herbert A. Miller's closest and most trusted financial advisor and personal confidante. *Id*. ¶ 8.

In his capacity as vice-president and chief financial officer of Miller Industries, the plaintiff was paid a salary that was modest compared to the compensation received by similarly situated chief financial officers of other Maine companies. *Id*. ¶ 9. Herbert A. Miller entrusted the plaintiff with all aspects of his personal and business finances, and, on many occasions over the course of their relationship, urged the plaintiff to remain in his position as vice-president for finance of Miller Industries. *Id*. ¶ 10.

Many times during the course of his employment with Miller Industries, the plaintiff expressed concern to Herbert A. Miller about his ability to care for himself and his family at his current salary, and, in particular, about whether he would be able to support himself following his eventual retirement. *Id*. ¶ 11. Miller Industries provided no retirement or pension benefits to its employees. *Id*. In response to the plaintiff's concerns, and in order to induce him to remain as vice-president of Miller Industries and to forego other employment opportunities, Herbert A. Miller told the plaintiff that he would "be taken care of" in Herbert A. Miller's will. *Id.* ¶ 12. Herbert A. Miller promised that the plaintiff would have "nothing to worry about" when it came time for him to retire from employment with Miller Industries. *Id*.

In approximately 1993, Herbert A. Miller executed a Last Will and Testament in Maine that contained express provisions for the benefit and protection of the plaintiff. *Id*. ¶ 13. In December 1996, Herbert A. Miller executed another will in Maine, which named the plaintiff as the personal representative of Herbert A. Miller's estate. *Id*. ¶¶ 14-15. This will also contained

express provisions for the benefit of defendant Jo Miller, Herbert A. Miller's second wife, and other members of his family. *Id.* ¶ 16. It also includes the following provision, in Article VII(A):

> I give and devise to DAVID J. ROBINSON of Falmouth, Maine, if he survives me: (i) the sum of Fifty Thousand Dollars ($50,000); (ii) twenty percent (20%) of the then outstanding stock of Miller Industries, Inc., or its successor; and (iii) two and one-half percent (2.5%) of the then outstanding stock of Miller Hydro Group, a Maine corporation, or its then successor.

*Id.* ¶ 17.

Over the course of their business and personal relationship, Herbert A. Miller frequently referred to this provision of the 1996 will in conversation with the plaintiff and provided him with a copy of the duly executed 1996 will. *Id.* ¶ 18. After executing a third codicil to the 1996 will, Herbert A. Miller told the plaintiff that he intended to increase the amount of stock of Miller Hydro Group that the plaintiff would inherit from 2.5% to 5%. *Id.* ¶ 19. These assurances induced the plaintiff to serve without compensation as personal financial advisor to Herbert A. Miller and to forego economic and employment opportunities that would otherwise have been available to him. *Id.* ¶ 20.

Herbert A. Miller requested that the plaintiff serve as the trustee of four trusts created by Herbert A. Miller to serve his personal and philanthropic interests. *Id.* ¶ 21. The trusts were the Herbert A. Miller Charitable Remainder Unitrust, the Herbert A. Miller Charitable Remainder Annuity, the Jo Pollock Trust, and the Miller Foundation. *Id.* ¶ 22. The plaintiff served as a trustee of these trusts without remuneration. *Id.* ¶ 23. By their terms, upon the death of Herbert A. Miller, the remaining corpus of the Unitrust, the Annuity Trust, and the Pollock Trust, together with the residue of his estate, would pass to the Miller Foundation for the advancement of its charitable purposes. *Id.* ¶ 24. Herbert A. Miller instructed the plaintiff that, as the trustee

of the Miller Foundation, he was to protect, preserve, and uphold its charitable purposes. *Id*. ¶ 25.

Herbert A. Miller and Jo Miller had a premarital agreement. *Id*. ¶ 25. Herbert A. Miller frequently expressed concern to the plaintiff about Jo Miller's spending habits and financial management skills. *Id*. ¶ 26. He also expressed concern about the extent to which Jo Miller and her son, John Pollock, were involved in the management of Miller Industries. *Id*. Herbert A. Miller refused to give Jo Miller signature authority over his banking and investment accounts and shared such signature authority solely with the plaintiff. *Id*. ¶ 27.

By the terms of the 1996 will, in the event that the Miller Foundation was unable to act in conformance with the provisions of the Internal Revenue Code governing charitable organizations, the plaintiff was to have complete and sole discretion to direct the assets constituting the residue of Herbert A. Miller's estate to other organizations based on the charitable purposes described to the plaintiff both orally and in writing by Herbert A. Miller. *Id*. ¶ 28.

Herbert A. Miller and the plaintiff met on a regular basis for discuss Miller's business and personal financial affairs. *Id*. ¶ 29. These meetings occurred at the business offices of Miller Industries in Lisbon Falls, Maine, and at the Millers' home in Portland, Maine. *Id*. ¶ 30. Between 2002 and 2007, Jo Miller often participated in these meetings. *Id*.

After the defendants established their primary residence in San Francisco in 2007, the plaintiff and the defendants continued to meet in person and by telephone. *Id*. ¶ 31. The in-person meetings occurred both in Maine and in California. *Id*. Over time, Jo Miller became more assertive in her views concerning the operation of Herbert A. Miller's businesses and the management of his personal finances. *Id*. ¶ 32. During these meetings, she often complained

about decisions made concerning Herbert A. Miller's business affairs, her lack of control over those decisions, and her status in Herbert A. Miller's estate plan, including the extent to which she was entitled to his assets under the premarital agreement she had entered into in 2001. *Id*. ¶ 33.

At various times between 2003 and 2008, Jo Miller pressured and attempted to influence the plaintiff and/or Herbert A. Miller to modify his estate plan and/or authorize expenditures from the trusts in favor of Jo Miller or her children. *Id*. ¶ 34. Over this period of time, Herbert A. Miller became progressively more physically and mentally infirm and less able to make decisions or comprehend issues relating to his personal or business affairs. *Id*. ¶ 35. Beginning in 2008, the plaintiff was denied direct and private access to Herbert A. Miller by Jo Miller. *Id*. ¶ 36. As late as November 2007, Herbert A. Miller affirmed the 1996 will as the instrument governing his estate plan. *Id*. ¶ 37.

In January 2010, Herbert A. Miller purportedly removed the plaintiff as trustee of the Jo Pollock Trust and appointed a California attorney, Garrick S. Lew, as trustee. *Id*. ¶ 38. In February 2010, the plaintiff was contacted by California attorney Evelyn A. Low, who, purporting to represent Herbert A. Miller, requested that the plaintiff resign as the trustee of the Unitrust and the Annuity Trust. *Id*. ¶ 39. On or about February 25, 2010, the plaintiff executed his resignations from those positions. *Id*.

In April 2010, Attorney Lew requested that the plaintiff resign as trustee of the Miller Foundation. *Id*. ¶ 40. The plaintiff requested that he first be permitted to speak directly and privately with Herbert A. Miller in order to satisfy himself as to Mr. Miller's intentions. *Id*. In April 2010, the plaintiff received a telephone call from Jo Miller in California, who stated, "Herb wants to talk to you." *Id*. The telephone was then given to Herbert A. Miller, who told the

plaintiff that "you have some papers that need to be signed." *Id*. When the plaintiff stated that he wanted to discuss the papers, Herbert Miller said, "Come on over" in a manner that demonstrated that he did not understand that the plaintiff was in Maine. *Id*. The plaintiff suggested that the two should meet when the Millers returned to Maine in a few weeks and Herbert Miller agreed. *Id*. ¶ 42.

The defendants later returned to Maine but made no attempt to communicate or meet with the plaintiff. *Id*. ¶ 43. On Friday, July 16, 2010, Jo Miller and two Maine attorneys met with the plaintiff at his office at Miller Industries in Lisbon Falls. *Id*. ¶ 44. At this meeting, Jo Miller told the plaintiff that, effective immediately, his employment with Miller Industries was terminated, and that the decision to terminate his employment had been made by Herbert A. Miller. *Id*.

Also at this meeting, the plaintiff was presented with a document entitled "Separation Agreement and General Release," which by its terms would have paid the plaintiff $50,000 in two installments provided that he continue to provide unlimited consultation and assistance to Miller Industries for the remainder of 2010 and required him to waive and release any and all claims he might have against Miller Industries or the defendants. *Id*. ¶¶ 45-47. One of the attorneys present stated that Miller Industries' willingness to enter into the Separation Agreement was contingent upon the plaintiff's resignation as trustee of the Miller Foundation. *Id*. ¶ 48.

At the meeting, the plaintiff told Jo Miller and the attorneys that it would be necessary for him to speak directly and privately with Herbert Miller concerning his termination and to confirm his status under Herbert Miller's estate before making a decision about whether to execute the Separation Agreement. *Id*. ¶ 49. He was told that this information would be

7

provided to him. *Id*. Following the meeting, the plaintiff was advised that Herbert Miller had no interest in speaking directly and privately with him about any matter. *Id*. ¶ 50.

Following the meeting, the plaintiff made several additional requests that the defendants confirm his status under Herbert Miller's estate plan and, specifically, to confirm his status as the personal representative under the 1996 will and as a beneficiary under that will. *Id*. ¶ 51. He received no response to these requests. *Id*. The plaintiff believes that his status as a beneficiary under that will has been modified to his detriment or eliminated altogether. *Id*. ¶ 52.

Herbert A. Miller is now 93 years old and has for several years suffered from physical infirmities and a diminished mental capacity that has rendered him unable to manage his affairs, to comprehend legal documents, to appreciate the effect of changes to his estate plan or the 1996 will upon the plaintiff, or to resist efforts by Jo Miller to influence him unduly with respect to these things. *Id*. ¶ 56. Jo Miller, by the exercise of undue influence or by fraud or intimidation, has caused Herbert A. Miller to modify his estate plan and the 1996 will to the detriment of the plaintiff in order to obtain economic advantages for herself and/or others. *Id*. ¶ 57.

The plaintiff possessed a valid prospective economic advantage in his employment. *Id*. ¶ 60. Jo Miller's statements to the plaintiff on July 16, 2010, that the decision to terminate the plaintiff's employment was made by Herbert A Miller or that Mr. Miller was unwilling to speak directly and privately with the plaintiff were false. *Id*. ¶ 62. Jo Miller, through the exercise of undue influence, or fraud or intimidation, caused Herbert A. Miller to terminate or to acquiesce in the termination of the plaintiff's employment. *Id*. ¶ 65.

The plaintiff was devoted to the careful and dutiful handling of the business and personal affairs of Herbert A. Miller for over 28 years. *Id*. ¶ 68. In exchange for the plaintiff's continued service to him and to Miller Industries, Herbert A. Miller made explicit promises to the plaintiff,

8

documented in the 1996 will. *Id.* ¶ 69. In reliance on these promises, the plaintiff remained in the employ of Miller Industries and was induced to forego other advantageous economic opportunities. *Id.* ¶ 70. Jo Miller was aware of her husband's promises to the plaintiff, including the terms of the 1996 will, and of the plaintiff's reliance on those promises. *Id.* ¶ 71. Jo Miller acted purposefully and with malice to cause Herbert A. Miller's estate plan to be altered or amended to the detriment of the plaintiff and to cause his employment to be terminated. *Id.* ¶ 72.

### III. Discussion

#### A. Count V

Count V of both versions of the complaint seeks a promissory estoppel against Herbert A. Miller. The defendants contend that this claim is barred by the statute of frauds and the Maine Probate Code. Motion at 4-7. They invoke the following statutory provisions:

> No action shall be maintained in any of the following cases:
> \* \* \*
> **5. Agreement not to be performed within one year.** Upon any agreement that is not to be performed within one year from the making thereof;
> \* \* \*
> **7. Agreement to give property by will.** Upon any agreement to give, bequeath or devise by will to another, any property, real, personal or mixed;
> \* \* \*
> unless the promise, contract or agreement on which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith, or by some person thereunto lawfully authorized[.]

33 M.R.S.A. § 51 (statute of frauds).

> A contract to make a will or devise, or not to revoke a will or devise . . . can be established only by (1) provisions of a will stating material provisions of a contract; (2) an express reference in a will to a contract and extrinsic evidence proving the terms of the contract; or (3) a writing signed by the decedent evidencing the contract. The execution of a joint will or mutual wills does not create a presumption of a contract not to revoke the will or wills.

9

18-A M.R.S.A. § 2-701 (from the Maine Probate Code).

These statutes, on their faces, do appear to bar Count V. The amended complaint does not include any allegation of the existence of a written promise to include the plaintiff as either a beneficiary of Herbert A. Miller's will or as personal representative of his estate. The plaintiff, however, responds that "Maine law recognizes numerous exceptions to the statute of frauds." Plaintiff's Objection to Defendants' Motion to Dismiss Counts V and VI of Complaint ("Opposition") (Docket No. 12) at 8. He relies on an equitable exception set out in section 139 of the Restatement (Second) of Contracts, which provides:

> (1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires.
>
> (2) In determining whether injustice can be avoided only by enforcement of the promise, the following circumstances are significant:
>    (a) the availability and adequacy of other remedies, particularly cancellation and restitution;
>    (b) the definite and substantial character of the action or forbearance in relation to the remedy sought;
>    (c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence;
>    (d) the reasonableness of the action or forbearance;
>    (e) the extent to which the action or forbearance was foreseeable by the promisor.

Restatement (Second) of Contracts § 139 (1981). This provision of the Restatement has been adopted by the Maine Law Court. *Chapman v. Bomann*, 381 A.2d 1123, 1127 (Me. 1978).

However, neither side of this dispute has been able to cite case law applying this section of the Restatement to the Maine statutes that are involved here. If this section were applicable in the manner claimed by the plaintiff, it would render both statutes unenforceable, because it could

always be said that injustice will result if the promise upon which a promisee has relied is not fulfilled. Subsection (2) of section 139, not quoted by the plaintiff in his brief, creates limitations on subsection (1), and, for example, it is immediately apparent from the amended complaint that, in this case, other remedies are available to the plaintiff.

In *Ingram v. Rencor Controls, Inc.*, 217 F.Supp.2d 141 (D. Me. 2002), the plaintiff sued his former employer on the basis of oral promises to pay him a certain salary and to transfer 10% of the defendant's stock to him, if he remained employed by the defendant. *Id.* at 145. In evaluating a pleaded count claiming promissory estoppel in the context of a motion to dismiss, this court said the following with respect to the alleged promise to convey stock:

> [T]he amended complaint does not allege any injury sustained by the plaintiff's alleged reliance, which the plaintiff identifies as his decision to continue working for the defendant, on that promise. It is for this reason that the amended complaint fails to state a claim on which relief may be granted under Maine law as well [as New York law]. The plaintiff cannot avoid the holding of *Stearns* [*v. Emery-Waterhouse Co.*, 596 A.2d 72 (Me. 1991)] to the effect that promissory estoppel may not serve as the basis for avoiding the statute of frauds in the context of employment merely by alleging promissory estoppel as the basis of a separate count.

*Id.* at 153.

The plaintiff attempts to distinguish this case, and others that have arisen in Maine in the context of employment, by asserting that "this case does *not* involve a claimed breach of an employment contract or pre-employment reliance upon an employment promise. . . . Rather, it alleges *a breach of a promise to devise property* which was intended to and did in fact induce action or forbearance by the Plaintiff over a long course of dealing." Opposition at 10 (emphasis in the original). But, that is exactly what happened in *Ingram*: the plaintiff alleged breach of a promise to convey property that induced him to remain employed. The *Ingram* plaintiff did not

"los[e] his employment"; he resigned after the employer allegedly repeatedly refused to transfer the promised stock. 217 F.Supp.2d at 145.

The plaintiff's reference to "pre-employment reliance" is a reference to *Stearns*, where the Law Court stated:

> We affirm that equitable estoppel, based upon a promisor's fraudulent conduct, can avoid application of the statute of frauds and that this principle applies to a fraudulent promise of employment. But we decline Stearn[]s['] invitation to accept *promissory* estoppel as permitting avoidance of the statute [of frauds] in employment contracts that require longer than one year to perform. Although section 139 of the Restatement may promote justice in other situations, in the employment context it contravenes the policy of the Statute to prevent fraud. It is too easy for a disgruntled former employee to allege reliance on a promise, but difficult factually to distinguish such reliance from the ordinary preparations that attend any new employment.

596 A.2d at 74-75. While that case involved a pre-employment promise, I do not find it distinguishable on that basis.

My conclusion that *Ingram* supports dismissal of the plaintiff's promissory estoppel claim is buttressed by *Busque v. Marcou*, 147 Me. 289, 86 A.2d 873 (1952), to the extent that the plaintiff relies on the 1996 will itself as "an ample memorandum of his promise to the Plaintiff" "were a writing required." Opposition at 11 & n.4. The Law Court rejected this argument in *Busque*. *Id*. at 292-93, 875.

The defendants are entitled to dismissal of Count V.[4]

## B. Count VI

Count VI of both the initial and the amended complaint seeks an equitable accounting against both defendants. Amended Complaint ¶¶ 90-95. The defendants contend that the court

---

[4] Given this basis for my decision that this count be dismissed, it is not necessary to reach the plaintiff's alternative argument that he is entitled to undertake discovery, specifically, to try to get Herbert A. Miller to admit all of the facts necessary to establish the plaintiff's claims, before the court may determine whether to dismiss Count V. Opposition at 12. In any event, this is not a valid argument in opposition to a motion to dismiss, where the only question is the sufficiency of the allegations in a complaint.

may not order the accounting of the assets and liabilities of Miller Industries and Miller Hydro, as the plaintiff demands, *id*. ¶ 95, because they are not parties to this litigation, and because the plaintiff, not having brought this action in his capacity as trustee of the Miller Foundation, lacks standing to obtain such relief. Motion at 7-8. The defendants also assert that the plaintiff has an adequate remedy at law. *Id*. at 8-9.

The plaintiff responds, first, that he is entitled to an accounting of the assets of Miller Industries and Miller Hydro because he "claims financial interests in [their] assets." Opposition at 15-16. He cites no authority for this argument.[5] Indeed, the plaintiff's detailed arguments on this point would serve a motion for pre-judgment security far better than they do his argument in opposition to the motion to dismiss Count VI. Thus, he asserts that the allegations in the amended complaint "create[] a strong inference that Defendant Jo Miller remains intent on extricating the Plaintiff from her husband's financial affairs so that she can exert unfettered influence and control over them[,]" *id*. at 17; that the allegations "make clear that the assets of the Miller corporations are at risk of mischief at the hands of the Defendants and, in particular, Defendant Jo Miller, and auger strongly in favor of an accounting[,]" *id*. at 18; that "[i]t would indeed offend equity were the Plaintiff to achieve a judgment pursuant to his tort claims only to find that the assets he was promised had been manipulated or plundered to his detriment by the Defendants[,]" *id*.; that an equitable accounting is appropriate where it would be "vexatiously inconvenient and expensive" for him to ascertain the current value of the assets and liabilities of Miller Industries and Miller Hydro, although it would apparently be too difficult for him to

---

[5] The plaintiff does cite *Harmon v. Harmon*, 404 A.2d 1020, 1024-25 (Me. 1979), for the proposition that an "expectant legatee or heir has [an] interest of immediate economic value demand remedy at time of suit." Opposition at 15-16. To the extent that this is meant as an assertion that the opinion in *Harmon* supports the plaintiff's argument, as set forth above, it is erroneous. The language in the opinion closest to that quoted above from the plaintiff's memorandum of law merely establishes that an expectant legatee or heir has a sufficient "interest of immediate economic value" to allow him or her to sue others for tortious interference with that expectancy, a legal claim. That is an unexceptionable statement that has no bearing on the question of whether such an individual may seek an equitable accounting of the assets of the still-living expected legator.

13

predict the expense and effort that would be involved, *id*. at 19; and that the defendants may resist discovery on this issue, *id.* The latter two assertions are, in addition, too speculative to support Count VI, even given the relaxed standard applicable to the allegations in a complaint when the motion pending is one to dismiss. In addition, the plaintiff offers no argument or authority for the necessarily-implied foundation of these arguments, that an equitable accounting may be awarded by the court before trial.

The plaintiff also asserts that "[a] trustee may bring a suit in his individual capacity to enforce the property rights of the trust and the beneficiaries, particularly where the trust does not expressly delegate the power to litigate solely to the trustees[,]" citing a 1993 case from the Texas Court of Appeals. Opposition at 16 n.8. Assuming *arguendo* that Maine law would be interpreted by the Law Court as the Texas court interpreted Texas law in that case, the amended complaint does not appear to allege that the Miller Foundation's governing document or documents do not "expressly delegate the power to litigate solely to trustees." I note as well that Maine law expressly provides that trustees have the authority to sue. 18-B M.R.S.A. § 816(24). The amended complaint does not establish any basis to allow the plaintiff, in his individual capacity, to sue the defendants for an accounting of assets of the corporations in which the foundation for which he serves as trustee may have an expectancy interest.

The plaintiff suggests that "Maine courts have recognized the reach of a court-ordered accounting to include estate planning documents that are relevant to the claims of a lawsuit and otherwise susceptible to discovery," citing *Estate of Hoch v. Stifel*, 2011 ME 24, ¶¶ 13, 14, 17, 16 A.3d 137, 144-45. Opposition at 20. The defendants take issue with this reading of the opinion, Reply at 7, but the assertion in any event is premature, where the plaintiff has not

established his right to such an accounting and discovery of some such documents is underway. *See* Report of Hearing and Order re: Discovery Dispute and Status (Docket No. 24).

In light of the foregoing, I need not reach the defendants' additional contention that Count VI should be dismissed because the plaintiff has alleged an adequate remedy at law for his claims. Motion at 8-9.

### IV. Conclusion

For the foregoing reasons, the defendants' motion to dismiss Counts V and VI of the first amended complaint is **GRANTED**.

Dated this 30th day of June, 2011.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge